# EXHIBIT "I"

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

DOCKET NO. 2:15-8401

- - -

ALEJANDRO MORALES,  
on behalf of himself and  
those similarly situated,

    Plaintiff,

       v.

HEALTHCARE REVENUE RECOVERY  
GROUP, LLC, and  
JOHN DOES 1 to 10,

    Defendants.

- - -

DEPOSITION UNDER ORAL EXAMINATION OF

ALEJANDRO MORALES

Hackensack, New Jersey

January 13, 2017

- - -

REPORTED BY:  MAUREEN A. REVIE, RPR

- - -

MAGNA LEGAL SERVICES  
(866) 624-6221  
www.MagnaLS.com



Page 14

1    members?
2        A.    Not at this moment.
3        Q.    Have you sent any letters out or
4    any type of investigation as to who else would
5    have received any type of letter like you did?
6        A.    That's for my counsel.
7        Q.    So the answer is no?  I am asking
8    if you did.
9        A.    I, myself, no.
10       Q.    So going to the private life, so
11   your position is that HRRG exposed information
12   relating to your private life?
13       A.    Yes.
14       Q.    Explain that for me.
15       A.    What details are you asking for?
16       Q.    Explain the basis, the factual
17   basis for that claim.
18       A.    Exposing a person's mailing address
19   that can be shared through a barcode.  That is an
20   invasion of my privacy.
21       Q.    So your position is they disclosed
22   your mailing address?
23       A.    My name and my mailing address,
24   yes.
25       Q.    In that barcode?

Page 15

1        A.    That's correct.
2        Q.    But your attorney has provided a
3    scan of the barcode.  Do you know that?
4        A.    Yes, I do.
5        Q.    I didn't see that your name was in
6    any way revealed in the scan of that barcode.
7              MR. AGLOW:  Is that a question?
8              MR. SCHEUERMAN:  Yes.
9              MR. AGLOW:  That was a statement.
10             MR. SCHEUERMAN:  It's a question.
11             MR. AGLOW:  Objection to form.  I
12   don't see a question there.
13   BY MR. SCHEUERMAN:
14       Q.    I didn't see your name in the
15   barcode, did you, that was scanned?
16       A.    No, I did not.
17       Q.    What is your basis for saying that
18   your name was exposed?
19       A.    Well, anyone in this day and age in
20   the information technology age can get that
21   information and do a name lookup and address
22   lookup, a reverse lookup and just by having a
23   person's address you can get a person's name, you
24   can get a person's telephone number, you can get a
25   person's age, you can get a list of their

Page 16

1    relatives.
2        Q.    You would agree with me that the
3    letter - - address on the letter, your address and
4    your name that wasn't in the barcode, that was
5    visible on the outside of the letter, correct?
6        A.    That's correct.
7        Q.    Is there any other way to send the
8    mail other than putting someone's name and address
9    on the letter that you know of on the letter?
10       A.    On the letter, no.
11       Q.    Again, you're saying that your name
12   was disclosed in the barcode.  I read the scan of
13   the barcode.  Your name isn't disclosed in the
14   scan of the barcode, correct?
15       A.    When I looked at it, no, it did not
16   show my name.  It did show my address.
17       Q.    It didn't show your whole address,
18   right?
19       A.    No.
20       Q.    It did show 15 Major Street, but it
21   didn't show your whole address?
22       A.    No.
23       Q.    And, again, your address was
24   actually listed on the letter, right?
25       A.    That's correct.

Page 17

1        Q.    Without being in the barcode,
2    correct?
3        A.    That's correct.
4        Q.    So what is the difference between
5    having 15 Major in a barcode and then having it
6    just plainly on the outside of the envelope?
7        A.    Well, if you do a scan of that
8    barcode, you instantly get the option to share
9    that by e-mail or by SMS which is a text message
10   with a graphic.
11             So if someone wanted to get my
12   information, they can easily just download a
13   barcode scan software, scan that and then send
14   that to someone.
15       Q.    So the only information that you
16   have told me that relates to you within the scan
17   of the barcode is it says 15 Major S, right,
18   that's it?  I will show you.  That's it, right?
19       A.    Yes.
20       Q.    Do you think that that's private
21   confidential information?
22       A.    No.
23             MR. SCHEUERMAN:  P-1.
24             (Exhibit P-1, BARCODE SCANNER
25   DOCUMENT, marked for identification.)

Page 18

BY MR. SCHEUERMAN:
Q. Do you know that your attorney actually filed that on the public federal docket?
A. Yes.
Q. So do you think that a scan of that, is that personal private information?
A. The account number, yes.
Q. What account number?
A. The account number [redacted]
Q. And you know you produced two documents in this case, one of them was a letter that you wrote to HRRG. I have it here. You list your account number on there and it's not [redacted] it's something else.
   The account number that you list on the letter, the only letter you wrote to HRRG, the one you produced, it says -- you list your account number as something else?
A. That's correct.
Q. So what is your basis for saying that is an account number?
A. Well, a lot of people have different account numbers associated with their name and address. Just like you have a cable bill that has an account number. You have a utility

Page 19

bill that has an account number.
   All those account numbers point to your name, address, possible telephone number, possible personal information in regards to your age, your race, possible bank account records.
   So [redacted], the last time I checked is not my Social Security number. It's not a serial number that is tattooed on me. It's not associated with me as a person. So it's obviously an account number.
Q. Couldn't it be a string of numbers that is not an account number?
A. That is a possibility.
Q. Do you know one way or the another whether it's simply a string of numbers? Let's say it's a string of numbers used simply to sort return mail.
   Do you know one way or another whether it's a string of numbers used to sort return mail?
A. Do you?
Q. Do you?
A. No, I do not.
Q. So, as you sit here today, what's your factual basis for telling me that that string

Page 20

of numbers, [redacted] is an account number as opposed to any other innocuous set of numbers?
A. That, I do not know.
Q. You said that -- strike that.
   What can you do with that? So you scan it, right, on your phone? Have you scanned it before?
A. Yes.
Q. What did you use to scan it?
A. I used a -- I actually have it on my phone. It's called QA Barcode Scanner.
Q. What kind of phone?
A. It's an LG, Android.
Q. Did you download other types of barcode scanners before you found that one?
A. I did.
Q. Was it a trial and error using the other ones?
A. No.
Q. Because I downloaded -- I have an iPhone. I downloaded a number of them and for me I found that some of the scanners were better than others. Is that your case as well?
A. Yeah, and that does happen with a lot of apps with phones. Some work better than

Page 21

others.
Q. The app that you have used is -- can you say that again?
A. QA Barcode Scanner.
Q. Is that available for your type of phone and for other types of phones?
A. It's in the android store.
Q. Do you know whether it's available for an iPhone?
A. That, I don't know.
Q. So you downloaded -- when did you download the app?
A. When I first got this.
Q. When did you receive the letter, by the way?
A. In 2014 -- I'm sorry -- 2015.
Q. What day?
A. I don't remember the exact date.
Q. One of the things I asked your attorney to bring today was the envelope. Do you have the envelope?
A. No.
Q. Did you retain the envelope?
A. No.
Q. Why not?

Page 26

1   Q.   That's my point. I don't have it.
2        MR. SCHEUERMAN: Do you have the
3   original letter?
4        MR. AGLOW: Are you asking for it?
5        MR. SCHEUERMAN: Do you have the
6   original letter?
7        MR. AGLOW: Are you asking for the
8   production?
9        MR. SCHEUERMAN: I asked for it
10  months ago.
11       MR. AGLOW: Are you asking for it
12  right now?
13       MR. SCHEUERMAN: If you have it,
14  yes. This is what you have? You don't have
15  anything with writing on the back?
16       MR. AGLOW: That's what we have.
17       MR. SCHEUERMAN: That's what I
18  have. Thank you.
19  BY MR. SCHEUERMAN:
20  Q.   Did you know that the letter that
21  you received had writing on the back of it?
22  A.   Well, that's the original. So if
23  there's no writing on the back, there's no writing
24  on the back.
25  Q.   Your testimony is there was not

Page 27

1   writing on the back of the letter that you
2   received?
3   A.   With my two eyes I am looking at
4   the original letter. It has the original folds.
5        MR. AGLOW: Let's mark it for ID.
6        MR. SCHEUERMAN: Do you want to
7   mark this original one?
8        MR. AGLOW: A sticker on the back.
9   We don't want to lose possession of the original
10  letter.
11       THE WITNESS: There is no writing
12  on the back of the letter.
13       MR. SCHEUERMAN: What about a
14  second page? We can mark this letter.
15       (Exhibit P-2, LETTER FROM HRRG
16  DATED 12/3/14, marked for identification.)
17  BY MR. SCHEUERMAN:
18  Q.   Do you know if it had a second
19  page?
20  A.   No.
21  Q.   We will say P-2 for the record.
22  P-2, you're identifying this as the actual
23  original letter that you received from HRRG,
24  right?
25  A.   Yes.

Page 28

1   Q.   Can I take a look at that? What
2   part of this letter was - - obviously you have the
3   barcode and your position is that was visible
4   through the window envelope, correct?
5   A.   Correct.
6   Q.   What other parts of the letter
7   could you see through the envelope?
8   A.   Just the barcode, the numbers
9   underneath it, my name, address, and another
10  barcode underneath the city, state and ZIP.
11  Q.   So you see at the bottom of this
12  letter there is a client account number, a
13  creditor account number and a pin, correct?
14  A.   That's correct.
15  Q.   Those are all different from what a
16  scan of the barcode reveals, correct?
17  A.   That's correct.
18  Q.   In fact, when you wrote HRRG in
19  response to this letter, you stated that your
20  account number was something other than ▇▇▇?
21  A.   That's correct.
22  Q.   Can you identify on this letter
23  what you conveyed to HRRG was your account number?
24  A.   I conveyed the account number that
25  was listed here in plain view. It shows account

Page 29

1   number ▇▇▇▇▇▇▇
2   Q.   Why did you choose that one? Is
3   that the client account number or creditor account
4   number or the pin, which one is that?
5   A.   It just shows account number.
6   Q.   You picked the one that says
7   account number. Why did you choose that one as
8   opposed to the creditor account number?
9   A.   I honestly did not know what they
10  would use to refer to when I wrote that letter.
11  So using my best judgement, I used the account
12  number that was next to my name.
13  Q.   You mean you didn't know what your
14  actual account number was with HRRG?
15  A.   What they had on their record, no,
16  but using my best judgement, according to the
17  letter that was provided, I gave them the account
18  number that was next to my name.
19  Q.   It wasn't next to your name, it was
20  at the bottom of the letter, right?
21  A.   Which is next to my name. If you
22  look at this it says regarding Morales, Alejandro.
23  Q.   Let the record reflect that at the
24  bottom of the letter he is referring to the
25  number. All right.

Page 30

1  Q. So you scanned it a couple of days
2  later because this letter peaked your interest?
3  A. Yes.
4  Q. Now, the scan of the letter reveals
5  this ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6  What did that mean to you? What is
7  it? Do you understand it's not a Social Security
8  number, right? It's not your Social?
9  A. No, it is not.
10 Q. We understand that ▓▓▓▓ that's
11 the first digits of your street address, right?
12 A. That's correct.
13 Q. Your actual address and name was
14 visible to anyone outside a barcode on the actual
15 letter?
16 A. That's correct.
17 Q. Because that's the only way I know
18 of to mail letters is to put someone's address on
19 it?
20 A. That's correct.
21 Q. So are you saying that having a
22 first portion of your street address in a barcode
23 - - are you saying that was a violation of the
24 law?
25 A. I am saying that using this

Page 31

1  technology, also with the actual listing of my
2  name and address can invade my privacy, yes.
3  MR. SCHEUERMAN: Can you repeat the
4  question, please?
5  (Whereupon, the testimony was read
6  back by the reporter.)
7  MR. AGLOW: Objection.
8  THE WITNESS: I am not a lawyer.
9  MR. AGLOW: He is not an attorney.
10 I'm not sure what you mean by the law.
11 BY MR. SCHEUERMAN:
12 Q. You can answer.
13 A. I am not a lawyer.
14 Q. Can you answer one way or another?
15 A. I don't know. I am not a lawyer.
16 MR. AGLOW: Asked and answered.
17 BY MR. SCHEUERMAN:
18 Q. So you're not taking a position one
19 way or another because I know you said before
20 that, you know, you were concerned that debt
21 collectors were - - you brought the lawsuit
22 because your private information was being
23 conveyed, right?
24 A. Correct.
25 Q. So is that what you told me, your

Page 32

1  private information being conveyed, the fact that
2  ▓▓▓▓ was in the barcode, in your opinion?
3  A. In my opinion, it can be used to
4  invade my privacy.
5  Q. So ▓▓▓▓ - so if I am scanning
6  this, I know nothing about Mr. Morales. What can
7  I do as a third party who scans that letter with
8  ▓▓▓▓ what can I do with that?
9  A. Well, you're forgetting to mention
10 that barcode is just above my name and address.
11 Q. Your address is already listed
12 outside of the barcode?
13 A. So using that barcode along with
14 the information that is in plain view underneath
15 that barcode being my name, my physical address,
16 you can use that information to violate my privacy
17 and obtain information, more information about me.
18 We live in an information age.
19 Q. Yes, we do. Let me write this
20 down. So let's focus on the ▓▓▓▓ That
21 doesn't tell me anything that's not in plain view
22 outside of the barcode because your address is on
23 there, correct?
24 A. That's correct.
25 Q. So if I am some nefarious third

Page 33

1  party and I get this letter. I don't open it
2  because if I open it, then I would have all your
3  - - I would have the other contents of the letter.
4  So let's just focus on the
5  nefarious third party getting that letter and
6  scanning it. If I scan it, I am going to have
7  ▓▓▓▓ and ▓▓▓▓ which is already in plain view
8  of the letter.
9  How do you go about obtaining
10 private information about Mr. Morales armed with
11 that information?
12 A. I wouldn't know how to do that.
13 Q. You don't know of any website that
14 I could go to and plug in ▓▓▓▓ and the rest of
15 that sequence and find out information about
16 Mr. Morales?
17 A. I wouldn't know that.
18 Q. Have you tried?
19 A. Yes.
20 Q. What types of things did you try to
21 do?
22 A. Since I am not a hacker - -
23 Q. We don't want you to hack.
24 A. You're asking me my opinion. I am
25 giving it to you.

Page 34

1  Q. What types of things did you try to
2  do to see what could be revealed by that barcode?
3  A. I went onto Yahoo, I went onto
4  Google, I went onto MSN and I went onto Bing, the
5  major search engines for the internet.
6  Q. Okay. Just to clarify, we are not
7  talking about hacking because if you are hacking
8  then it's a different ball game.
9  A. Well, but you did mention nefarious
10 third parties. It's hard to ignore the elephant
11 in the room when you're talking about a third
12 party. A third party could be a telemarketing
13 company, a third party can be another debt
14 collector, a third paper can be an attorney trying
15 to gain information about me for the purposes of
16 discovery, a third party could be a hacker that
17 wants to obtain my financial records to try to
18 delete my bank account. Those are nefarious third
19 parties.
20 Q. Good point. Let's take out hackers
21 for a second. We can revisit that.
22       All those other categories, do you
23 know of any way that these other parties that you
24 mentioned, third parties, could go about taking
25 Mr. Morales' address and the scan of that barcode

Page 35

1  and learn anything about Mr. Morales?
2  A. I am not an expert in that and all
3  that is all hypothetical. So from what I tried to
4  find, I could not find. That does not mean that
5  somebody else could find it.
6  Q. I don't want you to speculate.
7  What we are here to do is see - - I am not asking
8  you to speculate. I am simply saying, do you know
9  of a way, do you, Mr. Morales?
10 A. No.
11 Q. So when you said before that you
12 tried, what did you do on Yahoo, Google and Bing?
13 Did you just put that string of numbers, the scan,
14 within Yahoo and Google and hit return and see
15 what came up?
16 A. I typed in  without
17 a city, state or ZIP. I typed in Alejandro
18 Morales. I typed in Alejandro Morales, 15 Major
19 Street, Clifton, New Jersey 07013 - - because I
20 don't memorizes the last four, 2901. I don't
21 think anybody does.
22       I typed in all the different
23 versions of any type of combinations that you can
24 think of without using a calculator or some type
25 of supersonic algorithm to do different numerous

Page 36

1  combinations of the letters and numbers that are
2  here.
3        When I did a search for
4  Alejandro Morales, 15 Major Street on the white
5  pages it showed my name, my age, it showed
6  previous addresses, it showed possible relatives
7  with their names and phone numbers if they are not
8  blocked.
9  Q. I found that too, but the
10 distinction is that you can get all that stuff
11 without even scanning the barcode because your
12 name is on the letter, right, Alejandro Morales,
13 15 Major Street, and your whole address is on the
14 letter.
15       So without scanning the barcode, I
16 could have Googled that and I could have gotten
17 all that stuff that you got from what you just
18 told me, right?
19 A. That's correct.
20 Q. So what I am focussing - - again,
21 as you said, we live in an information age. If I
22 put in Christian M. Scheuerman, stuff is going to
23 come up. If I put in Alejandro Morales - - I have
24 done it - - there's a lot of Alejandro Morales
25 across the country and a plethora of information

Page 37

1  comes up from putting your name in there, right?
2  A. Correct.
3  Q. And there's websites out there that
4  list addresses. I got your address. I Googled
5  it, just your name. That came up, right?
6        So I am not focussed on that. I am
7  focused on what you can get that's different, what
8  you can get that's different from putting in that
9  string of numbers that that scan reveals, the
10 ███████████ and the rest of that?
11 A. You're still asking me something
12 that I have no expertise in. I am not a hacker.
13 I am not a debt collection agency that hires
14 professionals to gather information. I am not - -
15 I don't work for an attorney's office where I am
16 given a task of getting as much information about
17 a client or a defendant or a plaintiff so I have
18 information about them in order to know more about
19 this person.
20       That is not my profession, that is
21 not my expertise. So I cannot say that I was able
22 to do what you're asking me about.
23 Q. What do you do for a living?
24 A. I work with computer. I am also an
25 author.

Page 38

1  Q.  How many books have you written?
2  A.  Six.
3  Q.  What are the names of your books?
4  A.  The first one is called Cougar.
5  The second one is Cougar II. The third one is
6  Cougar III. It's a trilogy. My fourth book is
7  called The Release. The fifth book is called The
8  Release Part II and the sixth book is Route 0.
9  Q.  Have you talked about anything
10 related to this case in your books?
11 A.  No.
12 Q.  If I were to buy a book, which one
13 would be the best book?
14 A.  Route 0 and The Release.
15 Q.  So what do you do in computers?
16 A.  I do IT support.
17 Q.  Where do you work?
18 A.  I currently work for - - as a
19 contract-to-hire for Robert Half Technology. At
20 the moment, I am contracted to a company called
21 All Covered and they are a subsidiary of
22 Konica Minolta.
23 Q.  Have long have you been working in
24 the IT field for?
25 A.  Almost two decades.

Page 39

1  Q.  Do you have a special degree in IT?
2  A.  A degree, no.
3  Q.  What type of training do you have
4  for IT?
5  A.  I am a Microsoft certified
6  professional, MCSA, and ITIL certified.
7  Q.  What about college, do you have a
8  college degree?
9  A.  Yes.
10 Q.  What is your degree in?
11 A.  Legal studies.
12 Q.  Do you have any other degrees after
13 college other than the certifications you told me
14 about?
15 A.  Just the certifications.
16 Q.  You have been working in the IT
17 field for two decades?
18 A.  Almost two decades.
19 Q.  Would you say you know a little
20 more about computers than the average Joe?
21 A.  That's correct.
22 Q.  Did you type in this string of
23 numbers that's revealed in the scan? Did you type
24 that full string into Google or any other type of
25 search engine?

Page 40

1  A.  Can you clarify when you say full
2  string? Are you talking about the ▓▓▓▓ or are
3  you talking about the ▓▓▓▓?
4  Q.  That's a good point. Let's start
5  with did you type ▓▓▓▓?
6  A.  Yes.
7  Q.  Did anything come up of relevance?
8  A.  No.
9  Q.  And was that done in Yahoo, Google
10 and Bing?
11 A.  Yes.
12 Q.  When you say - - now it makes more
13 sense. When you said those were the major search
14 engines because I knew Google, I knew the other
15 ones, but did you type in the ▓▓▓▓
16 ▓▓▓? Did you type that full string into - -
17 A.  No, I did not.
18 Q.  Why not?
19 A.  Frustration.
20 Q.  What do you mean by frustration?
21 A.  There are some different ways to do
22 a search on the internet using all the different
23 search engines that I listed. You just run out of
24 time to look at all that.
25 Q.  How much time did you spend looking

Page 41

1  into internet research relating to that barcode
2  scan?
3  A.  I would say maybe ten minutes.
4  Q.  In total?
5  A.  That is approximate.
6  Q.  So is it safe to say that you - -
7  in terms of - - I know you're not an expert,
8  you're not a hacker. Could you be a hacker with
9  your experience?
10 A.  No.
11 Q.  You don't have the expertise to be
12 a hacker?
13 A.  No. I am a technician. So I am
14 break/fix, I am a server, some networking, but no
15 hacking. That's code.
16 Q.  That is - -
17 A.  That's not me. I am not even a
18 gamer.
19 Q.  So is there anything that you have
20 found just in your investigation that using the
21 internet that that string of numbers on P-1
22 reveals about Mr. Morales?
23 A.  Can you repeat that question?
24 Q.  Is there anything that just gives
25 that string of numbers meaning that you found in

Page 42

```
 1   your investigation?
 2       A.   The [redacted], along with the name
 3   and address that's exposed on the envelope, yes,
 4   as I stated before.
 5       Q.   Even outside the scan, you have [redacted]
 6   [redacted] even if you don't scan it. You have
 7   Mr. Morales and [redacted]?
 8       A.   That's correct.
 9       Q.   Is there additional -- so is there
10   any way that I could put that in per your
11   investigation online and find out perhaps your
12   Social Security number that you know of?
13       A.   To a layman, no.
14       Q.   Is there any way that you can put
15   that information into a search engine on the
16   internet and find that relates to a debt?
17       A.   No.
18       Q.   Is there any way that you can put
19   that into the information that relates -- that
20   conveys specifically that HRRG had sent you a
21   letter?
22       A.   No.
23       Q.   Did you ever call HRRG after
24   receiving the letter?
25       A.   No, I sent them a letter.
```

Page 43

```
 1       Q.   I got that. Other than that, did
 2   you have any other correspondence with HRRG?
 3       A.   No.
 4       Q.   Is there a reason why this debt
 5   wasn't on your bankruptcy petition?
 6       A.   I forgot about it.
 7       Q.   Bankruptcy has been discharged,
 8   though?
 9       A.   Yes.
10       Q.   Have you received any other
11   collection letters from HRRG?
12       A.   No.
13       Q.   Just circling back to one of the
14   first questions I asked you, you're talking about
15   -- I am paraphrasing what you said, that you
16   wanted to hold HRRG accountable for revealing
17   information about people's private lives; is that
18   accurate?
19       A.   Yes.
20       Q.   Just circle back to that. After
21   what we discussed, what information have they
22   revealed as to Mr. Morales about your private
23   life?
24       A.   Well, once again, I can't go into
25   all of the details of what could possibly be
```

Page 44

```
 1   revealed about me.
 2       Q.   Don't speculate. Just within your
 3   personal knowledge.
 4       A.   That's the thing. I don't have any
 5   personal knowledge about what may have been
 6   revealed about me.
 7       Q.   What about you also said violating
 8   your privacy. What have you learned through your
 9   investigation in terms of any way that HRRG
10   violated your privacy by sending that December
11   letter that's in front of you, the December 2014
12   letter?
13       A.   I consulted with my attorney.
14       Q.   My question is, do you know of how
15   that letter in any way violated your privacy
16   rights?
17       A.   Well, like I said, I consulted my
18   attorney. I have an attorney that I work with. I
19   showed him the letter. I asked him is
20   anything --
21       Q.   I don't want you to tell me what
22   the attorney said.
23       A.   I wouldn't tell you what he said.
24   When I got this letter, I did my scan. I replied
25   to the letter. I also consulted my attorney.
```

Page 45

```
 1       Q.   But circling back, you said that
 2   one of the things -- goals in this lawsuit was to
 3   prevent HRRG from violating people's privacy
 4   rights, correct?
 5       A.   That's correct.
 6       Q.   How do you maintain -- I know you
 7   spoke to the attorney, but do you have an
 8   independent belief of how HRRG violated your
 9   privacy rights?
10       A.   Having this barcode here, along
11   with my name and address, having the availability
12   to scan this barcode and be able to share this by
13   e-mail or SMS.
14       Q.   Sharing what?
15       A.   The barcode. So having this
16   barcode along with my name and address. All it
17   takes is a scanner and you could either write down
18   the address that's under the barcode or take a
19   picture of it.
20       Q.   We are not talking about the
21   address because that's on the envelope and in the
22   barcode, right?
23       A.   That's correct, but it is relevant.
24   You're asking me why I am doing this.
25       Q.   I asked you how that letter
```

Page 46

1  violated your privacy rights.
2      A.  Yes, I am explaining myself. So
3  the combination of the barcode through trial and
4  effort - - I am not saying it was an easy thing to
5  do - - through trial and effort you can scan this.
6  So we are not disputing this can be scanned.
7      Q.  I got you.
8      A.  You can scan this. You can share
9  this through different methods.
10         Same thing with my name and
11 address. You can write it down, you could take a
12 picture, you can send a text. This being an
13 information age, you can gather that information
14 and use this in many, many ways.
15         I am not an expert on how to expose
16 people. I am not an expert in hacking or doing
17 identity theft or marketing, but I know this
18 information can be used in ways to invade a
19 person's privacy.
20     Q.  You don't know how specifically it
21 can be used?
22     A.  No.
23     Q.  When you say the barcode scanner
24 can be shared, you don't know - - again, you
25 haven't uncovered anything which gives that - -

Page 47

1  what a scan of that reveals, right?
2      A.  No.
3      Q.  You would be sharing something that
4  is just literally a string of numbers that you
5  don't know what it means, correct?
6      A.  That's correct.
7      Q.  You're saying that your address can
8  be shared but, again, your address isn't in that
9  barcode, your full address, right?
10     A.  That's correct.
11     Q.  And it's on the outside of the
12 letter which is not within the barcode, correct?
13     A.  It's underneath the barcode.
14     Q.  Yes. Any idea what - - I am
15 guessing that the S here is just street?
16     A.  Yes, street.
17     Q.  Any idea what A is?
18     A.  That's unknown. So that could
19 either be the initial of my first name - -
20     Q.  Again, I don't want you to
21 speculate unless you have a basis for it.
22         When you say the information can be
23 used in many ways, I get your name and address can
24 be used, but the basis of the lawsuit, it's not
25 any violation to have your name and address on the

Page 48

1  letter, right? The basis of this lawsuit is what
2  a scan reveals?
3         MR. AGLOW: You used the word
4  violation. Violation of what?
5         MR. SCHEUERMAN: To have the
6  address on the letter is not a violation of the
7  law.
8         MR. AGLOW: That's not what you
9  said. You completed the sentence by saying
10 violation of the law.
11        I am objecting because you have to
12 define what law you're talking about so he
13 understands that you're asking a legal question
14 about whether it violates any particular law.
15 BY MR. SCHEUERMAN:
16     Q.  To your understanding, are you
17 maintaining that having your address printed on
18 the outside of the envelope, is that one of the
19 claims that you have against HRRG?
20     A.  It's not in the lawsuit, no.
21     Q.  So you're not saying that HRRG
22 should not have sent the letter with your name and
23 address on it, correct?
24     A.  I am not saying that.
25     Q.  Again, just circling back, you said

Page 49

1  before that the information can be used in many
2  ways. So you're saying the scan of that barcode
3  can be used in many ways, correct?
4      A.  I am assuming that, yes.
5      Q.  You're speculating, right?
6      A.  Yes.
7      Q.  Because from your knowledge and
8  understanding and investigation, you haven't found
9  a way to use that scan of that barcode to reveal
10 anything about Mr. Morales, correct?
11     A.  Correct.
12     Q.  So, again, when you said the basis
13 for bringing this lawsuit you also want to stem
14 other forms of a harassment, but you're not saying
15 other than the barcode there is no other
16 allegation that there are any other things that
17 HRRG did wrong, correct?
18     A.  That's correct.
19     Q.  You said before it wasn't the
20 easiest thing in the world talking about scanning.
21 Do you remember that?
22     A.  Yes.
23     Q.  What do you mean by that?
24     A.  Well, with a lot of different types
25 of apps you can install on a phone, most people

## Page 74

1  A. I can't say yes or no to that
2  because of the information that I found during my
3  personal investigation.
4  Q. Is there any difference from your
5  - - I don't know if you looked into it - - would
6  there be any difference between a barcode and a
7  QR code?
8  A. I didn't look that extensively.
9  Q. Paragraph 33 of the complaint,
10 "HRRG used the same procedures it used in sending
11 the HRRG letter to plaintiff when sending the same
12 and/or similar letters to numerous other New
13 Jersey consumers."
14    Do you know what - - when it's
15 saying used the same procedures, do you know what
16 that's talking about?
17 A. I would assume the letters.
18 Q. Again, I don't want you to
19 speculate. Do you know what that's referring to?
20 A. As far as I know, just the letters.
21 Q. When it says the same procedure,
22 your interpretation is that they are just sending
23 the same letters to other individuals?
24 A. That's my interpretation.
25 Q. Do you know one way or the other

## Page 75

1  whether the same letter was sent to any other
2  individuals in New Jersey that's marked P-2?
3     MR. AGLOW: Are you asking him the
4  same letter or similar letter? Clarify the
5  question.
6  BY MR. SCHEUERMAN:
7  Q. Do you know whether a letter in
8  that format, P-2, was sent to any other individual
9  in New Jersey?
10 A. No.
11 Q. Do you know whether the same
12 envelope that you received was sent to any other
13 individuals in New Jersey?
14 A. No.
15 Q. You haven't done any investigation
16 as to that, correct?
17 A. Correct.
18 Q. Number 35 of the complaint talks
19 about "HRRG's policy and practice to send written
20 collection communications, in the form exemplified
21 by Exhibit A," and Exhibit A is - - this was
22 actually redacted, but P-2 is Exhibit A. Do you
23 have any factual - -
24 A. Clarify what redacted means.
25 Q. There is no barcode in its place.

## Page 76

1  It says redacted.
2     My question is simply, do you have
3  any knowledge behind that allegation in paragraph
4  35 that it's HRRG's policy and practice to send
5  collection letters in the form exemplified by
6  Exhibit A? Do you have any factual knowledge or
7  any other additional information?
8  A. No.
9     MR. AGLOW: To himself or to other
10 people?
11 BY MR. SCHEUERMAN:
12 Q. Do you have any factual knowledge
13 regarding that contention in the complaint?
14    MR. AGLOW: Paragraph 35?
15    MR. SCHEUERMAN: Yes.
16    MR. AGLOW: The contention in that
17 paragraph is simply that it was - - it's their
18 policy and practice to send letters in the form
19 exemplified by Exhibit A.
20    I am asking you whether you're
21 asking whether or not P-2, which is the same as
22 Exhibit A, are you asking whether he has knowledge
23 that it was sent to other people because the 35
24 doesn't talk about other people.
25 BY MR. SCHEUERMAN:

## Page 77

1  Q. You can answer, Mr. Morales.
2  A. No, I don't know if they sent this
3  to other people.
4  Q. Again, Paragraph 39, it says you
5  seek to recover statutory damages, attorney's fees
6  and costs on behalf of all class members.
7     Are there any additions to that in
8  terms of damages that you're seeking?
9  A. No.
10 Q. If you go to page eight of nine,
11 there is Roman numeral VIII, prayer for relief?
12 A. VII?
13 Q. Yes. Paragraph 62, Letter B, for
14 maximum statutory damages. We talked about
15 statutory damages.
16    Why is it - - why do you want
17 maximum - - why are you entitled to maximum
18 statutory damages?
19 A. My rights were violated. My
20 privacy was violated. I want someone held
21 accountable for that.
22 Q. As we discussed before, you can't
23 tell me exactly how your rights and privacy were
24 violated, correct?
25 A. I cannot. That's - - pardon me. I

Page 78

1  need water. That's really just speculation in
2  regard to how exactly it was done.
3      Once again, I don't practice
4  hacking information, stealing, so I can't say
5  exactly how that was done.
6      Q.  So if you can't say exactly how,
7  why do you think you're entitled to maximum
8  statutory damages?
9      A.  Accountability.
10     Q.  This is based on your, as you said,
11 speculation that someone could use this
12 information for something, correct?
13     A.  That's correct.
14     Q.  Paragraph 58 on that same page,
15 "HRRG sent a letter" -- strike that.
16     "The HRRG letter and the letters
17 that are the same and similar in the form to the
18 HRRG letter were sent by HRRG to plaintiff and
19 those similarly situated in an attempt to collect
20 the debts."
21     It's true that you don't know the
22 state of the envelopes of any other individuals
23 who received any letter from HRRG, correct?
24     A.  Correct.
25     Q.  So you wouldn't be able to tell me

Page 79

1  one way or another whether the envelope was
2  potentially damaged, correct?
3      A.  Correct.
4      Q.  Or whether the letter had shifted
5  in the envelope, correct?
6      A.  Correct.
7      Q.  You redacted the letter that's
8  attached to Exhibit A to the complaint, correct?
9  The actual barcode in the letter was redacted,
10 right?
11     A.  I see that.
12     Q.  Do you know a reason why an
13 unredacted version was filed on the public federal
14 database on the public docket?
15     A.  That's for my attorney.
16     Q.  You don't know.  Were you involved
17 in the decision that said, well, I am going to
18 file an unredacted version?
19     MR. AGLOW:  Objection.
20 Attorney-client privilege.
21     MR. SCHEUERMAN:  I am asking
22 whether he knows.
23     MR. AGLOW:  The only way he can
24 answer that would be what conversations he had
25 with his attorney.  Rephrase it.

Page 80

1  BY MR. SCHEUERMAN:
2      Q.  You're saying that on your advice
3  of attorney the unredacted version was filed on
4  the public database?
5      A.  Isn't that confidential?
6      Q.  I am not asking you what you said.
7  I am saying that's your testimony on the advice of
8  counsel the unredacted version was filed?
9      A.  Yes.
10     Q.  Do you think that that barcode, is
11 that something that's confidential?
12     A.  You're talking about the barcode
13 itself?
14     Q.  In other words, it was filed.
15 Anyone can access what's filed on the public
16 database.  So anyone can access the unredacted
17 letter.  Anyone can see what a scan of that
18 barcode reveals.
19     My question is, do you think that
20 that letter, the unredacted version of the letter
21 is private?
22     MR. AGLOW:  I object.  First of
23 all, it's compound and second of all, it's a lot
24 of things that aren't in evidence concerning what
25 people can see on the public website.

Page 81

1  MR. SCHEUERMAN:  You can see
2  everything on the public website.  You can answer.
3  MR. AGLOW:  You're not testifying
4  today.
5  MR. SCHEUERMAN:  You can answer.
6  Read back the question.
7      (Whereupon, the testimony was read
8  back by the reporter.)
9      A.  No, it's not private.
10 BY MR. SCHEUERMAN:
11     Q.  I am looking at -- there was a
12 filing called Rule 26, disclosures by your
13 attorney.  I can show it to you if you want, but
14 for the purpose of my question you may not need to
15 see it.
16     One of the things is it lists your
17 name and it says the subject of your knowledge and
18 it says information regarding the nature of the
19 debt at issue and the defendant's efforts to
20 collect on an alleged debt.
21     What do you know -- other than
22 what you told me, what else do you know about the
23 nature of the debt at issue?
24     MR. AGLOW:  Asked and answered.  Go
25 ahead and answer it again.

Page 102

```
 1    A.    Can you clarify what you mean by
 2  focus in?
 3    Q.    Sure. In other words, was it
 4  something you got and it was mailed to you and you
 5  just opened it because it was in your mailbox or
 6  did you focus on that window before you opened it,
 7  if you recall?
 8    A.    I don't recall.
 9    Q.    Again, you can't tell me one way or
10  another whether any of the other proposed class
11  members, whether the barcode was actually visible
12  in any type of window envelope that they received,
13  correct?
14    A.    Correct.
15    Q.    Do you have any documents relating
16  to this underlying debt? Do you have any
17  documents like medical bills or anything like
18  that - -
19    A.    No.
20    Q.    - - in your possession?
21    A.    No.
22    Q.    Do you have any documents or any
23  documents in your possession which indicate that
24  ▆▆▆▆ is an account number, like any document - -
25  for instance, on this one this says account number
```

Page 103

```
 1  at the bottom and it has your account number
 2  ▆▆▆▆. It says account number. Do you
 3  have anything which says account number ▆▆▆▆?
 4    A.    That specifically says account
 5  number, no.
 6    Q.    How about - - there is nothing in
 7  the original - - you say you don't have any
 8  documents about the original debt. So you also
 9  wouldn't have any documents from ▆▆▆▆
10  ▆▆▆▆ which said that that's the account
11  number, correct?
12    A.    That's correct.
13    Q.    I asked you about websites. Do you
14  know of any public database different from a
15  website that you can enter a scan of the barcode
16  that's on P-1, that you can enter that into and
17  learn anything about yourself?
18    A.    No.
19    Q.    You would agree with me that you
20  can have a string of numbers on a letter which is
21  not actually an account number, correct?
22        MR. AGLOW: In what context?
23  Objection to form.
24  BY MR. SCHEUERMAN:
25    Q.    You can answer.
```

Page 104

```
 1    A.    It's a possibility.
 2    Q.    In other words, there's something
 3  that's classified as a pin here. It's not on P-2.
 4  It's not classified as an account number.
 5        So you would agree with me on this
 6  letter or on any type of letters that you received
 7  there can be a use for a string of numbers other
 8  than being an account number, correct?
 9        MR. AGLOW: Objection. Calls for
10  speculation.
11  BY MR. SCHEUERMAN:
12    Q.    You can answer.
13    A.    Well, actually your question is
14  both yes and no. Yes, it may not be an account
15  number, but seeing as how the acronym PIN stands
16  for personal identification number, it may not be
17  an account number, but that number is associated
18  with a person.
19    Q.    How do you know that pin stands for
20  personal identification number?
21    A.    Anyone with a credit card or a bank
22  debit card knows what a pin number is.
23    Q.    Other than that, any other examples
24  you can give me?
25    A.    Of what?
```

Page 105

```
 1    Q.    Strike that. I don't know the
 2  answer to that. That's a good question.
 3        You don't know of any third party
 4  who intercepted your letter, correct?
 5    A.    That's correct.
 6    Q.    Let me show you the letter that you
 7  wrote.
 8        MR. SCHEUERMAN: I'll mark this
 9  Exhibit 7.
10        (Exhibit P-7, LETTER DATED
11  12/10/14, marked for identification.)
12  BY MR. SCHEUERMAN:
13    Q.    I show you - - this is actually a
14  document you produced. It's Bates stamped Morales
15  HRRG2. That is your letter, right?
16    A.    Yes.
17    Q.    You wrote that?
18    A.    Yes.
19    Q.    How did you get that address for
20  HRRG, the Cincinnati, Ohio address?
21    A.    That's on the letter they sent to
22  me.
23    Q.    Did you receive any type of
24  response from HRRG to this letter?
25    A.    No.
```

Page 106

1    Q.    Under your name you list the
2  account number as ▮▮▮▮▮▮▮▮▮▮▮▮, correct?
3    A.    Correct.
4    Q.    You will agree with me that that
5  account number that you list is different than
6  P-1, what a scan of the barcode reveals, correct?
7    A.    That's correct.
8    Q.    Why did you use that as the account
9  number?
10   A.    You asked me this before.
11   Q.    Tell me again.
12   A.    Well, seeing as how looking at this
13 letter, P-2, and looking at the bottom of this
14 letter there is in plain view it says account
15 number with the number that is listed on this
16 letter. If you want me to read it, I can read it
17 and next to it it says regarding Morales,
18 Alejandro, which is who I am.
19         So seeing as how I wanted them to
20 know that this letter was coming from me, I used
21 information that they provided on this letter.
22   Q.    As your account number, correct?
23   A.    As the account number that they
24 provided on this letter.
25   Q.    When you say this letter, it's P-2,

Page 107

1  right?
2    A.    Yes.
3    Q.    You wrote this letter obviously
4  after receiving the letter, P-2, correct?
5    A.    That's correct.
6    Q.    The letter, P-2, was dated
7  December 3, 2014?
8    A.    Correct.
9    Q.    Is it fair to say that you received
10 the HRRG letter between December 3rd and
11 December 10, 2014?
12   A.    Yes.
13   Q.    So after - - did you write this
14 letter, the P-7 letter, after you scanned the
15 barcode on the December 3, 2014 letter?
16   A.    I don't recall.
17   Q.    I think your prior testimony was
18 you scanned it a couple of days after receiving
19 the letter. Do you remember that?
20   A.    If you are taking a couple as
21 literally two days, then I want to strike couple
22 because I didn't mean literally two days.
23   Q.    I don't know. You tell me.
24   A.    I will say a few days after I
25 received the letter. So I don't recollect the

Page 108

1  exact time frame when I did the scan.
2    Q.    You don't know whether it was
3  before or after?
4    A.    I can't recall.
5    Q.    When you're discussing at the
6  bottom of the letter that we will take legal
7  action, do you see that - -
8    A.    Yes.
9    Q.    - - talking about the bankruptcy.
10 Were you intending to convey the legal action also
11 involved issues with the barcode?
12   A.    No.
13   Q.    Do you know one way or another
14 whether a scan of - - strike that.
15        Do you know whether one way or
16 another ▮▮▮▮▮▮▮ is a number that has been assigned
17 to any other person in addition to you?
18   A.    No.
19   Q.    Have you seen the interrogatory
20 answers submitted by HRRG in this case?
21   A.    Have I seen their answers?
22   Q.    Yes.
23        MR. AGLOW: You're not referring to
24 P-6?
25        MR. SCHEUERMAN: No.

Page 109

1    A.    Okay. I don't have them in front
2  of me. Do you have a copy of them?
3  BY MR. SCHEUERMAN:
4    Q.    Yes. I just want to know - - let
5  me just ask the question. One of the questions,
6  not by you, answers by HRRG is that it is only
7  through the use of defendant's password protected
8  computer software which can only be accessed by
9  defendant's employees and which is not available
10 or accessible to anyone outside of the defendant's
11 company, that any additional information can be
12 revealed, meaning that that scan, you can only
13 obtain information from Mr. Morales if you use
14 their computer password software.
15        My question is simply, do you have
16 any information as you sit here today to refute
17 that?
18   A.    No.
19   Q.    Do you still want to see the
20 interrogatory answer?
21   A.    No.
22   Q.    So HRRG, they likewise submitted
23 responses to request for admissions. I can show
24 them to you, but I am - - do you want to see them?
25   A.    I will wait for you.

Page 110

1  Q. There was a question from your
2  attorney. It said whether it wants them to admit
3  or deny. You say, ▇ is a file number associated
4  with the obligation and HRRG said denied.
5       As you sit here today, do you have
6  any information to show that that was a file
7  number?
8       MR. AGLOW: Are you asking whether
9  he has information to what you call refute before
10 or are you asking him whether its accurate or not?
11      MR. SCHEUERMAN: Just what I asked
12 BY MR. SCHEUERMAN:
13 Q. Do you have any information - -
14 when I say information, anything gleaned from your
15 personal knowledge, from your investigation or
16 from anything, any of your personal knowledge
17 relating to this case, your investigation.
18      Do you have any information to say
19 that ▇ was a file number?
20      MR. AGLOW: You're not asking him
21 to attest to the accuracy of your own client's
22 statement?
23      MR. SCHEUERMAN: Of course not.
24 BY MR. SCHEUERMAN:
25 Q. Maybe the better question is, do

Page 111

1  you have any information to refute that? HRRG is
2  saying that's not a file number. Do you have any
3  information to refute that?
4       MR. AGLOW: Again, I want the
5  clarification because refute can be construed as
6  you asking this witness whether or not he agrees
7  with it.
8  BY MR. SCHEUERMAN:
9  Q. Do you agree with it?
10      MR. AGLOW: That's a new question
11 you're asking?
12      MR. SCHEUERMAN: Let me ask the
13 question. These aren't complicated questions.
14      MR. AGLOW: I haven't objected
15 much. I want to clarify as to - -
16      MR. SCHEUERMAN: You're clouding
17 the record.
18      MR. AGLOW: I am asking you to
19 clarify whether you are trying to ask the witness
20 whether an allegation by your client is true or
21 not true or whether you are simply asking whether
22 he has other evidence. Those are two different
23 questions.
24 BY MR. SCHEUERMAN
25 Q. The question is, ▇ is a file

Page 112

1  number associated with the obligation. Let me
2  show these to you.
3       MR. AGLOW: I don't know if that
4  will make a difference in terms of clarifying the
5  question. We will stipulate that you're reading
6  the correct question and answer.
7       MR. SCHEUERMAN: Thank you. I will
8  mark this P-8.
9       (Exhibit P-8, DEFENDANT'S RESPONSES
10 TO PLAINTIFF'S REQUESTS FOR ADMISSION, marked for
11 identification.)
12 BY MR. SCHEUERMAN:
13 Q. I show you what I marked P-8. I am
14 not showing it to you for you to authenticate it.
15 I am showing it to you for ease of questioning.
16 If you turn to number 16 - - and
17 just for background, these are questions which
18 your attorney has propounded on the defendant and
19 which the defendant has answered.
20      Number 16 wants the defendant to
21 admit or deny whether ▇ is a file number
22 associated with the obligation. HRRG says denied.
23      As you sit here today, do you have
24 any information which says otherwise?
25      MR. AGLOW: You haven't asked the

Page 113

1  question whether he understands what obligation
2  means.
3  BY MR. SCHEUERMAN:
4  Q. You can answer.
5  A. No, I don't.
6  Q. Number 17, ▇ is a reference
7  number associated with the obligation. HRRG says
8  denied.
9       My question is, do you have any
10 information which says otherwise?
11 A. No.
12 Q. We talked about the account number.
13 That's number 18. I take it you don't have any
14 information which says that it's an account
15 number, correct?
16 A. Correct.
17 Q. Same question for number 19. You
18 don't have any information that says it's a
19 registration code, correct?
20 A. Correct.
21 Q. After the letter was placed into
22 the mail - - strike that.
23      Was this sent regular mail, this
24 letter to you, P-2?
25 A. Yes, regular mail.

Page 114

```
 1     Q.    You don't know what happened to the
 2   letter obviously after it was placed in the mail
 3   by HRRG, correct?
 4     A.    Correct.
 5     Q.    Same is true with any of the
 6   proposed class members, you don't know the state
 7   of the letter, what happened to it after it was
 8   placed in the mail by HRRG, correct?
 9          MR. AGLOW: You mean potential
10   class members?
11   BY MR. SCHEUERMAN:
12     Q.    Potential class members. You don't
13   know, correct?
14     A.    That's correct.
15     Q.    Do you know whether HRRG - - if
16   someone were to call HRRG, whether there was a
17   process there to corroborate the person to
18   determine that that's the correct person calling
19   in to HRRG?
20     A.    No, I don't know.
21     Q.    Given that you don't know what a
22   scan of the barcode, what it means and you don't
23   know of any - - at least you don't know of any way
24   you could use that to obtain information about
25   Mr. Morales, do you find that it was still a
```

Page 115

```
 1   prohibited act for HRRG to do it, to send that
 2   letter?
 3          MR. AGLOW: Objection. Several
 4   reasons. First of all, I have no idea what you're
 5   referring to and secondly, it sounds like you're
 6   asking for a legal conclusion.
 7   BY MR. SCHEUERMAN:
 8     Q.    You can answer.
 9     A.    I mean, I honestly don't know.
10   That's why I talked to my attorney.
11     Q.    You don't know of using that
12   barcode, any way of using that barcode to
13   determine that the communication was from a debt
14   collector, correct?
15     A.    That's correct.
16     Q.    You don't have any way that you
17   know of to use that scan of that barcode to reveal
18   your financial position, correct?
19     A.    That's correct.
20     Q.    So you can't tell me that a scan of
21   that barcode identifies you as a debtor or refers
22   to the debt, right? There is no way that you have
23   determined how to use that to identify Mr. Morales
24   as a debtor and the letter relating to a debt?
25     A.    I, myself?
```

Page 116

```
 1     Q.    Correct.
 2     A.    Correct.
 3     Q.    You don't know in any way how to
 4   - - whether there is a way to decode that P-1, - -
 5   what a scan reads to find out information about
 6   Mr. Morales, correct?
 7     A.    I, personally, no.
 8     Q.    Again, you don't have any evidence
 9   that any third party intercepted your letter and
10   tried to use that barcode to steal your identity
11   or to obtain information about you, correct?
12     A.    Correct.
13     Q.    You don't know of any way to use a
14   scan of that barcode to identify your financial
15   status, correct, i.e., the fact that they are
16   saying you owed money to [redacted]
17   correct?
18     A.    Me, personally, no.
19     Q.    You keep saying me, personally.
20   You don't know of any other person who could do
21   that, correct?
22     A.    Isn't that the purpose of this
23   lawsuit?
24          MR. AGLOW: Asked and answered
25   several times. He testified about hackers.
```

Page 117

```
 1   BY MR. SCHEUERMAN:
 2     Q.    You said it would be speculation,
 3   right?
 4     A.    That's correct.
 5     Q.    Let get into the hackers because we
 6   never really delved into that. You're saying that
 7   even though you can't - - I am not saying that you
 8   would break the law. You're saying essentially
 9   that your expertise is not something which lends
10   itself to be a hacker because you're not trained
11   in writing code?
12     A.    Correct.
13     Q.    How do you maintain that a - -
14   what's the basis for you saying that a hacker
15   could use a scan of that barcode to do something
16   with it?
17     A.    I mean, I explained that before.
18   We live in an information age.
19     Q.    I want specifics. Do you know of
20   any specific way a hacker could take a scan of
21   that barcode?
22     A.    So now you're asking me how to do
23   it? We went from - -
24     Q.    Do you know how to do it?
25     A.    No, I do not know how to do that.
```